## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CORESTAR INTERNATIONAL PTE. LTD, | : | Civil Action No. 05-5850(NLH) |
| | : | |
| Plaintiff/ Counter Defendant, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| LPB COMMUNICATIONS, INC., DOMINICK SPADEA and THOMAS SPADEA, | : | |
| | : | |
| Defendants/ Counter Claimant. | : | |
| | : | |

**APPEARANCES:**

Paul A. Mainardi, Esquire
Brown and Connery
360 Haddon Avneue
P.O. Box 539
Westmont, NJ 08108

     *Attorney for Plaintiff*

Joseph D. Dinoto, Esquire
115 Mansfield Boulevard, South
Cherry Hill, NJ 08034

     *Attorney for Defendants*

**HILLMAN**, District Judge

    This matter has come before the Court on Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment. For the reasons expressed below, the parties' motions will be granted in part and denied in part.

## BACKGROUND

    This case involves a dispute over Plaintiff Corestar

International's purchase of shortwave radio transmitters and amplifier modules from Defendant LPB Communications ("LPB").  In the beginning of February 2005, Corestar International ("Corestar"), a company based in Singapore, inquired about purchasing seven 10kw shortwave transmitters from LPB, a company based in Camden, New Jersey.  Through email communications, the parties discussed the purchase price and terms of delivery. During their negotiations, Corestar inquired whether LPB could "stick to the old price," meaning whether LPB could price its transmitters based on the 2004 price list rather than the new 2005 price list, and whether LPB could "deliver the transmitters in a reasonable time frame."  (Pl.'s Ex. A at P001.)  LPB replied that it would have to "look at the numbers" about the pricing, and stated that regarding the delivery, the earliest that the transmitters would be ready was the middle of April or early May, with a delivery capacity of two transmitters a month.  (Id.)

On February 12, 2005, LPB sent Corestar an email with the following terms: "Selling cost to you = $48,996 each (based on a 7 transmitter order) 75% pre-pay[,] 25% Balance of each transmitter at shipping[.] Delivery schedule 2 transmitters per month.  Shipping cost - your side."  (Id. at P008.)  LPB also stated that a formal quote would be forthcoming.

On February 16, 2005, LPB emailed Corestar a formal quotation.  The quotation was dated February 15, 2005 and

2

contained the following relevant terms:

        Product:  10kW short-wave transmitter
                  Price: $46,995 each, Quantity 7 = $325,465

        VALIDITY OF QUOTE:  30 Days, subject to confirmation there
        after.  Quote # 103591

        Delivery Schedule:  Two transmitters per month starting June
        30, 2005 (earlier permitted)

        PAYMENT TERMS: Pre-payment 75% of full order value
                      Balance to be pro-rated against shipments


(Pl.'s Ex. B.)  The quotation also contained two fine-print

provisions:

        Prices are for transmitters as listed below,
        F.O.B. Camden, New Jersey, USA in U.S. Dollars.
        Acceptance of the Conditions Governing Quotations is
        automatic on issuance of a Purchase Order or Contract
        for any equipment offered by LPB Communications, Inc.

        CONDITIONS: The price and terms on the quotation
        are not subject to verbal changes or other agreements
        unless approved in writing by the Seller.  All
        quotations and agreements are contingent upon
        availability of materials and all other causes beyond
        our control.  Prices quoted are based on this quote in
        its entirety.  Terms inconsistent with those stated
        herein which may appear on the Purchaser's formal order
        will not be binding on the Seller.

(Id.)

        On February 17, 2005, Corestar emailed LPB its purchase

order.  The purchase order included a reference to quotation

number 103591, and contained the following relevant terms:

LPB 10KW SOLID STATE SW TRANSMITTER  7 set   46,995.00 328,965.00

. . .[1]

    EACH TX TO BE LABELED CLEARLY WITH
    FREQ & STATION NAME ON CRATE
    SPECIAL WOODEN CRATES PACKING
    2 TX PER MONTH FROM JUNE OR EARLIER
    LAST SHIPMENT BY O1 AUGUST

Remarks: Voltage is 220V unless stated otherwise above
75% DEPOSIT, BALANCE PRORATED

(Pl.'s Ex. B.)  The purchase order also contained a fine-print

provision:

    Goods will not be accepted unless our Purchase Order
    Reference is quoted.  Goods supplied must be in
    accordance with quality and quantity specified.  We
    reserve the right to cancel this order if materials are
    not delivered within the time specified and according
    to specification.

(Id.)

Corestar's email accompanying the purchase order also stated

that it wanted to further clarify the payment and delivery terms:

"We will pay a 75% deposit (US$244098.75) by Monday[.] The

balance of US$81366.25 is to be paid when the 6th tx is ready.

Trust that this is okay.  Kindly ensure that the transmitters are

labelled (sic) clearly with frequency and station name.  We also

hope to receive all the transmitters by 1 August and would like

to ship the last 3 transmitters together.  Thanks and look

forward to your reply."  (Pl.'s Ex. A at P0010.)

---

[1]The purchase order lists the name and frequency of each
transmitter.  This information is not relevant to the dispute.

That same day, LPB sent an email acknowledging receipt of Corestar's email and purchase order.  It stated that it would let LPB know when it received the money transfer, and it would "get the ball rolling immediately on procurement activities for this project."  (Id.)  The email also agreed to Corestar's statement of further clarification on the payment and delivery terms--"Ok to points below."  (Id.)  It ended the email with, "Thank you [a]gain for this excellent order and for your prompt actions." (Id.)

On March 31, 2005, Corestar emailed LPB, asking whether LPB could move up delivery of the first two transmitters and include three transmitters in the second shipment because Corestar's customer needed his transmitters "urgently."  (Id. at P0015.) Corestar also asked for a quotation on 28 700w short wave amplifier modules.  (Id.)  On April 2, 2005, LPB replied, providing a quote for the amplifier modules.  (Id.)  LPB did not address Corestar's request for expedited shipment of the transmitters.

On April 5, 2005, Corestar sent another email to LPB asking about the delivery schedule for the transmitters.  (Id. at P0017.)  Later that same day, LPB replied, stating that it was "still confident for June shipments and will do anything . . . to expedite."  (Id. at P0020.)  In an April 8, 2005 email, LPB stated, "regarding accelerating the schedule[,] while we will do

5

everything possible it will be difficult to be sure to move the schedule up." (Id. at P0021.)

On April 12, 2005, Corestar emailed LPB its purchase order for twenty-eight amplifiers totaling $28,644.00.  On its purchase order, which used the same form as the purchase order for the transmitters, Corestar stated that the amplifiers were to be shipped with the transmitters.  (Pl.'s Ex. D.)  LPB acknowledged the order in an email, stating, "All is 'right' with it.  Yes, we will make sure to deliver[] amps with transmitter shipments."  (Pl.'s Ex. A at P0027.)  Payment in full was made the next day via wire transfer.  (Pl.'s Ex. D.)

A couple weeks later on May 3, 2005, Corestar again asked LPB whether LPB would be able to "pull off a miracle" and have an early shipment of the first transmitter.  LPB replied, "No miracle yet.  I am trying however."  (Pl.'s Ex. A at P0026.)  A few weeks later, on May 24, 2005, Corestar sent LPB, which apparently had not been able to expedite shipping, another email asking for the status on the shipments of the transmitters, and whether LPB would be able to comply with the originally-agreed-upon schedule.  (Id. at P0033.)  LPB responded that "things have not gone as planned," due to production of transmitters for the government, as well as one of its lead engineer's medical emergency.  (Id.)  LPB stated that it was "working around this problem but it is having an impact on our best plans."  (Id.)

Corestar replied that it needed the transmitters by the end of June because it "already specified a definite delivery date" to its customer and "would face penalties" if the transmitters were not shipped on time.  (Id. at P0032-33.)  LPB responded that its "best hopes" would be to ship one transmitter by the end of June. (Id. at P0032.)

On June 14, 2005, Corestar notified LPB that its customer was concerned about the delivery of the transmitters, and asked for an update.  (Id. at P0031.)  The next day, LPB responded with "not so good news."  LPB explained that the government transmitters must be finished before Corestar's, and that shipment of Corestar's transmitters "look improbable for June," but are "certainly" expected to ship "at least one in July if not two."  (Id.)  Corestar replied on July 21, and related that it was "sorely disappointed."  Corestar stated that it had paid the seventy-five percent deposit in February "in the expectation that LPB will meet the agreed delivery schedule."  (Id.)  Corestar further explained that it made a business commitment to its customer and was "liable to deliver the goods as agreed." (Id.) Corestar requested the current time frame for delivery and needed "to know that best and worst case scenario."  (Id.)

In the days following that email, Corestar attempted to contact LPB again via telephone and email, and LPB responded on July 1, 2005.  LPB responded that it was "still difficult to

7

confirm the actual schedule." (Id. at P0030.)  It explained that its "problem from the beginning" was "getting the two transmitters . . . for the government out of here."  (Id.)  LPB acknowledged that it could not give Corestar a definite delivery schedule, but it would try to do so the next week.  (Id.)

On July 19, 2005, Corestar emailed LPB and implored LPB to provide a delivery schedule.  (Id. at P0035.)  LPB replied the next day, stating, in part,

> I apologize for not replying more promptly to you.  It is always difficult to reply when the news is not as good as it should be.  Frankly, the delay to ship the first Department of the Navy transmitter and the fact that we are working on the second of two for that order has delayed our work on your order.  Cutting to the key point I am 6 weeks away from delivering your first transmitter (best scenario).  Now the background.  Yes we are late.  The government transmitters are special custom transmitters and were ordered long before your transmitters.  I truly expected that we could finish these transmitters as early as March but technical issues and material delays delayed our effort.

(Id. at P0040-41.)  Corestar replied that LPB "took 75% deposit telling us that with that upfront money, we will not experience this problem we are discussing. . . . I guess we can only implore that you do your best as our money is already there with you." (Id. at P0040.)

On August 11, 2005, Corestar emailed LPB and informed it that it is in "dire straits" because its "dealer is in jail due to the inability to delivery the goods as promised and we have a responsibility towards his family in solving this problem."  (Id.

8

at P0065.)  It also stated, "According to your quotation and our purchase order, delivery was to be scheduled 2 transmitters / month starting from June.  However, it is now August and we still don't have a firm delivery date.  This is despite our 75% deposit in Feb when we placed the order!  It is great that LPB is doing well and securing many government tenders.  However, if you were not able to deliver according to your offer, our order should not have been accepted.  In accepting our deposit, you now owe us some due care & accountability."  (Id.)  Corestar then asked for a solution "urgently."  (Id.)

By August 16, 2005 Corestar proposed a new delivery schedule as per a telephone conversation between the parties on August 11. Corestar proposed that the first transmitter be shipped the first week of September, the second and third be shipped the first week of October, the fourth and fifth be shipped the first week of November, and the final two transmitters be shipped the first week of December.  (Id. at P0063.)  On August 19, 2005, LPB replied that "your schedule is OK for me. . . . Do you still need something formal from me?"  (Id.)  LPB then provided a letter "confirming a schedule for the delivery" of the transmitters.  It changed Corestar's proposed schedule by providing for shipment of one transmitter in the second week of September, October and November, and two transmitters in the second week of December and January.  (Id.)  LPB concluded that it has "confidence in this

schedule, this is manufacturing and there are no guarantees, just our promise to make every effort to meet this schedule and or improve on it." (Id.)

Corestar replied on August 22, 2005 and questioned why the schedule proposed in LPB's letter was different from the one LPB confirmed on August 17, as well as different from the schedule originally agreed upon. (Id. at P0067.) Corestar further questioned why "[w]ith every week, you are giving us a worse schedule without explaining why it is taking more than 5 months to build just 1 transmitter." (Id.)

After numerous email exchanges on the status of the shipment of the first transmitter, Corestar emailed LPB on September 8, 2005 stating that it was "imperative that the transmitter is shipped by 12 September from the factory. Any other delay will cause Corestar and our customer more problems." (Id. at P0082.) That evening, LPB responded that "the 12th will not happen" and that the earliest it could be shipped was September 16. (Id.) After days of more emails back and forth between the parties-- Corestar imploring that the transmitter be shipped and LPB explaining the difficulties it was facing--on September 21, 2005 Corestar sent LPB an email expressing how LPB's inability to ship any transmitters has "created chaos" in its business and has "totally ruined all goodwill" that it has "painstakingly built up over the years." (Id. at P0092.) It expressed that the third

10

delivery schedule LPB provided in its August 19, 2005 letter was "unacceptable," and based on even the second revised schedule, LPB would have had nine months to complete the order, which is "way beyond industry norm." (Id.)  Corestar requested a firm delivery schedule by September 23, and informed LPB that it and its customer would be coming to visit the factory in the following week.  (Id.)

Through even more email communications and LPB's failure to deliver the first transmitter, Corestar sent an email to LPB recapping the situation as it currently stood, and proposed a solution for a resolution.  Corestar stated,

> "At present, this is where we are and they are the facts:
> 1.  LPB is late in delivering the first set of our SW transmitter order by about 4 months.  Balance order remains at 06 sets.
> 2.  LPB currently has complete transmitter parts to build another 3 sets of SW transmitters.
> 3.  LPB does not have the capability to complete building and testing the balance of our 06 sets transmitter order in fashionable time.
> 4.  LPB is unable to confirm a definite delivery date for these balance 06 units."

(Id. at P0108.)

As a solution, Corestar proposed that: 1) LPB sell it three sets of parts so that it could hire someone to assemble the transmitters; 2) LPB continue to build the fifth transmitter with a firm shipment by mid-November; 3) let Corestar cancel the other two transmitters; and 4) LPB "remit back" the balance of Corestar's deposit. (Id.)

11

LPB replied that Corestar was not entirely correct on its first four points. (Id. at P00107.) LPB stated, "We are late in our delivery, but that is a fact of building custom transmitters and is a risk our customers bear from time to time when placing orders." (Id.) LPB also stated that it would be able to build all the transmitters. (Id.)

Corestar responded that it did not doubt LPB's ability to build the transmitters, only that it could not build them in the time frame initially agreed upon, and that the delay in shipping is "more than reasonable time for any manufacturer to be late." (Id. at P00106.) Corestar also disagreed with LPB's statement that "customers need to bear the risk of late delivery especially when the delivery schedule was set by you in your proforma invoice / offer to us in Feb 05. Further, we have already absorbed more than 3 months of delay (& worry) despite our constant followup . . . isn't that more risk than we should take?" (Id.)

On September 27, 2005, the first transmitter was shipped. (Id. at P00111.) Between that time and October 1, 2005, Corestar emailed LPB about its upcoming visit to LPB's factory without reply, but on October 1, LPB cancelled their meeting. It also proposed a fourth shipping schedule of the second transmitter to be shipped in November 2005, and then one transmitter shipped every six weeks after that. (Id. at P00121.)

Later that same day, the chairman and CEO of LPB, Defendant

Dominick Spadea, emailed Corestar the following, in relevant

part:

I am very sorry we have to meet under these circumstances of
you[r] unhappiness with the delivery of your product from LPB.
However, I believe it is important to remind you that LPB has
been in business for over forty years.  We are a major supplier
of quality products to the US Government and the world wide
commercial market.

I must tell you that in my long experience in business working
with customers I have never know[n] such unprofessional behavior
or bullying tactics that your company has used against my company
or it[]s employees.  It saddens me very much that our fine
relationship has come to this.

George Kuchmas is a dedicated and competent professional manager.
. . . [Y]ou must realize that he is doing everything he can to
build your SW products in as timely manner as is possible.
If in his judgment the schedule is what he has communicated to
you it is, then you must accept this.

. . .

In the mean time, however, you should understand that your
tactics are unprofessional and insulting to me.  Under our
contract you have no right to come to our plant uninvited to
"investigate" our production processes. And while I appreciate
the problems you are having with our delivery, this gives you no
special rights to harass our employees, meet with our former
owners as a way to pressure us, demand different ways to make the
product, or try scare tactics of showing up uninvited.
These tactics are not and will not ever be acceptable to me.

Your choices under the contract are as follows:

     1.   Accept the latest delivery terms and the original
     production methods and stop the unprofessional pressure that
     doesn't help you at all.
     2.   Cancell [sic] the contract and lose your deposit.
     3.   Enter into serious and respectful negotiations with me
     when I return. Either a new delivery time period based on
     information I find after I return to the plant on Oct 10;
     some change in LPB production method . . .; or some form of
     reimbursement of unexpected expenses that have been incurred

13

by you for our tardy delivery.  I am open to anything to []
calm the waters and achieve customer satisfaction first and
formost [sic].

(<u>Id.</u> at P00123-24.)

Corestar replied on October 3, 2005, stating that it was
"utterly disappointed & upset by your condescending emails," and
stated that "it is our greatest desire to reach an URGENT
resolution as time is of the essence right now."  (<u>Id.</u> at
P00126.)

The emails documenting the parties' communications stops
here in the record before the Court.  According to Corestar, on
October 15, 2005, its customer received the transmitter shipped
by LPB, but the customer determined that it was unsatisfactory
because cables were missing and the back panel was not included.
(Tan Cert. ¶¶ 38-39.)  Corestar fixed the transmitter, and the
customer paid for it, but the customer cancelled its order for
the remaining six transmitters.  (<u>Id.</u> ¶ 39.)  When Corestar's
customer cancelled its order due to the extensive delays,
Corestar "exercised its contractual rights" and cancelled its
order with LPB.  (<u>Id.</u> ¶ 40.)  Corestar also demanded return of
its deposit for the transmitters and its entire payment for the
amplifier modules.  (<u>Id.</u>)  LPB refused to refund Corestar any of
its money.  (<u>Id.</u>)  LPB's reason for not refunding Corestar its
deposit for the transmitters and amplifier modules was that its
deposit was non-refundable, and that Corestar's cancellation of

14

the contract was a unilateral cancellation without cause.
(Def.'s Statement of Facts ¶¶ 21, 29.)

Because LPB refused to refund Corestar its payment for the
transmitters and amplifiers, it filed the instant action against
LPB, claiming that LPB breached the contract.  It also claims
that LPB and the individual defendants, Dominick Spadea and
Thomas Spadea, committed fraud, violated the New Jersey Consumer
Fraud Act, have unlawfully retained Corestar's money, have
unlawfully converted Corestar's property into its own, and that a
constructive trust should be implemented to protect Corestar's
money.  LPB filed a counterclaim, claiming that Corestar breached
the contract and owes the full balance quoted for the original
transmitters, as well as additional monetary damages for injuries
to reputation and business.  Both parties have moved for summary
judgment.

## DISCUSSION

The lengthy recitation of the facts of this case has been
necessary to resolve the main issues before the Court: 1) did LPB
and Corestar have a contract, 2) what are the terms of the
contract, and 3) did either party breach the contract.  Once
these three issues have been resolved, Corestar's additional
claims can be addressed.

**I.    The Parties' Breach of Contract Claims**

**1.    Did LPB and Corestar have a contract?**

LPB argues that it is entitled to summary judgment because Corestar has not provided any evidence that a contract existed between the parties, and, because there is no contract, there can be no breach of contract.  This argument is completely untenable.  The law does not require the execution of a single document entitled "Contract" in order for there to be a contractual relationship between two parties.  See Kroblin Refrigerator Xpress, Inc. v. Pitterich, 805 F.2d 96, 107-08 (3d Cir. 1986) (holding that a contract need not be a single document).  As Corestar points out, but for the contract for the sale, purchase and delivery of transmitters and amplifiers, Corestar would not have paid $272,742.75 to LPB.  To hold otherwise would mean that Corestar's payments to LPB were gratuitous gifts.

Further illustrating the absurdity of this argument is LPB's own counterclaim for breach of contract.  It not only explicitly acknowledges the existence of a contract, it claims that Corestar unilaterally breached the contract, and seeks enforcement of the contract in its favor.  Corestar cannot be held to have cancelled, and LPB cannot seek enforcement of, an agreement that LPB declares does not exist.  Moreover, in addition to its affirmative claims, LPB's own admissions clearly establish that a contract existed between the parties.  LPB employee George

16

Kuchmas and LPB chairman and CEO Dominick Spadea both repeatedly refer to "the contract."

At the most basic level, a contract consists of an offer, acceptance and consideration.  In the case here, where merchants are contracting for the sale of goods, whether there is a contract, and what constitutes the contract, is governed by the Uniform Commercial Code, as enacted in New Jersey, N.J. Stat. Ann. 12A:1-101 to 9-710.[2]  The UCC provides "a comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods," and it sets forth the seller's and buyer's exclusive remedies in the event of breach.  <u>Spring Motors Distrib., Inc. v. Ford Motor Co.</u>, 489 A.2d 660, 665 (N.J. 1985).[3]

Specifically, section 2-207 applies here, and directs a two-step analysis to determine first whether there is a contract between the parties, and second to determine the terms of the contract.  Known as the provision that deals with the "battle of the forms," section 2-207 provides,

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed

---

[2]LPB and Corestar are "merchants" as described by N.J. Stat. Ann. 12:2-104 and the transmitters and amplifiers are "goods" as described by N.J. Stat. Ann. 12A:2-105.

[3]Neither party appears to dispute that New Jersey law applies.

upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

N.J. Stat. Ann. 12A:2-207.

With regard to whether a contract has been formed, section 2-207(1) governs the analysis.  LPB sent Corestar a quotation for seven transmitters and Corestar returned a confirming purchase order.[4]  Even though Corestar's purchase order contained "terms additional to or different from" LPB's quotation, it was a "definite and seasonable expression of acceptance" because it was not "expressly made conditional on assent to the additional or different terms."  Thus, based on UCC section 2-207(1), as well as LPB's own admissions, a contract between LPB and Corestar was

---

[4]A separate analysis of the contract for amplifier modules is discussed on pages 34-35.

formed.[5]  The next step, then, is to determine the precise terms of that contract.

### 2.   What are the terms of the contract between Corestar and LPB?

"When the parties' conduct establishes a contract, but the parties have failed to adopt expressly a particular writing as the terms of their agreement, and the writings exchanged by the parties do not agree," N.J. Stat. Ann. 12A:2-207(2) determines the terms of the contract.[6]  <u>Step-Saver Data Systems, Inc. v.</u>

_____

[5]The Uniform Commercial UCC requires that for the sale of goods for the price of $500 or more, a contract is not enforceable unless "there is some writing sufficient to indicate that a contract for the sale has been made between the parties." N.J.S.A. 12A:2-201(1).  The writing must also be "signed by the party against whom enforcement is sought," and it must specify a quantity.  <u>Id.</u>  If, "within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received."  <u>Id.</u> at 2-201(2).
This section deals solely with the question of whether a contract exists which is enforceable in the face of a statute of frauds defense.  It has no application to a situation where a contract does exist and the dispute goes only to the terms of that contract.  <u>See</u> <u>Step-Saver Data Systems, Inc. v. Wyse Technology</u>, 939 F.2d 91, 97 (3d Cir. 1991) (noting that "courts have typically treated the questions of formation and interpretation as separate from the question of when the contract becomes enforceable).  Here, because LPB has not raised a statute of frauds defense, and a contract does exist, this section is inapplicable.

[6]Section 2-207(1) applies to both additional and different terms.  Section 2-207(2), however, only applies to additional terms.  This distinction is not of importance here.  <u>Cf.</u> <u>Richardson v. Union Carbide Industrial Gases, Inc.</u>, 790 A.2d 962, 967-68 (N.J. Super. Ct. App. Div. 2002) (explaining the differing approaches taken by various courts to settle the question of the

Wyse Technology, 939 F.2d 91, 98 (3d Cir. 1991); see also Olefins
Trading, Inc. v. Han Yang Chem Corp., 9 F.3d 282, 287-88 (3d Cir.
1993) ("Section 2-207 of the UCC is designed to prescribe, by
law, what non-negotiated terms are to be considered a part of a
contract--not to exclude those terms specifically negotiated and
agreed upon.").

Here, the essential elements of the contract--the price,
quantity, delivery schedule, and shipment terms--are identical on
both documents.  It is only the fine-print terms on Corestar's
purchase order that differ from LPB's quotation.  LPB's fine
print provides,

CONDITIONS: The price and terms on the quotation are
not subject to verbal changes or other agreements
unless approved in writing by the Seller.  All
quotations and agreements are contingent upon
availability of materials and all other causes beyond
our control.  Prices quoted are based on this quote in
its entirety.  Terms inconsistent with those stated
herein which may appear on the Purchaser's formal order
will not be binding on the Seller.

In contrast, the fine print on Corestar's purchase order
provides,

Goods will not be accepted unless our Purchase Order
Reference is quoted.  Goods supplied must be in
accordance with quality and quantity specified.  We
reserve the right to cancel this order if materials are
not delivered within the time specified and according
to specification.

The terms in Corestar's purchase order are considered part

difference between "additional" and "different").

of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

**(a) *Whether the LPB's offer expressly limits acceptance to the terms of its offer***

LPB's quotation provides that "the price and terms on the quotation are not subject to verbal changes or other agreements unless approved in writing by the Seller."  This term does not expressly limit acceptance to the terms of LPB's offer, but instead prohibits changes to the terms.  Implicitly, this term allows a buyer to add additional terms as long as they do not change the terms.

LPB's quotation also provides that "[t]erms inconsistent with those stated herein which may appear on the Purchaser's formal order will not be binding on the Seller."  This term also does not expressly limit the acceptance of its offer to its terms; rather, it only excludes additional terms that are inconsistent with its offer, which is addressed in subsection (b).

**(b) *Whether Corestar's fine-print terms materially alter LPB's offer***

In order to determine whether Corestar's terms "materially alter" the terms of LBP's offer, each new term must be considered.  Corestar's first two additional terms state, "Goods

21

will not be accepted unless our Purchase Order Reference is quoted.  Goods supplied must be in accordance with quality and quantity specified."  These terms do not materially alter LPB's offer, and, even considering LPB's fine-print term that prohibits inconsistent additional terms, they are completely consistent with LPB's offer.

Corestar's third additional term states, "We reserve the right to cancel this order if materials are not delivered within the time specified and according to specification."  This term also does not materially alter LPB's offer.  LPB's quotation provides the specification for the transmitters as well as the delivery schedule.  Nowhere on LPB's quotation does it state that a buyer cannot cancel the contract if materials are not delivered on time and according to specification.  Furthermore, by LPB providing a shipment schedule and specifications on its quotation, Corestar's additional term concerning the shipment schedule and specifications is not inconsistent with the terms of LPB's offer.  Consequently, none of Corestar's additional terms materially alter LPB's offer.

**(c) *Whether LPB notified Corestar of its objection to Corestar's additional terms***

There is no evidence in the record to demonstrate that LPB notified Corestar of its objection to the additional terms on Corestar's purchase order, either prior to receiving the order or within a reasonable time after receiving the order.  As a result,

22

the terms of the parties' contract include the fine-print terms on both LPB's quotation and Corestar's purchase order.

### 3.   Did either party breach the contract?

Based on the terms of the contract, Corestar argues that it was entitled to cancel the order for the transmitters because they were not delivered within the time specified and according to specification.  Corestar also argues that it is entitled to, at a minimum, the refund of its deposit for the transmitters. LPB contends, however, that Corestar's deposit for the transmitters is non-refundable because it is LPB's policy and practice that all deposits are non-refundable, and Corestar was aware that its deposit was non-refundable because of its past dealings with LPB.  LPB also contends that Corestar is liable for breach of contract when it cancelled the order because it was aware that all schedules were tentative as is standard in the industry.  Additionally, LPB contends that the clause in its quotation--"All agreements are contingent upon availability of materials and all other causes beyond our control"--absolves it from any culpability for its delays.

As a primary matter, it must be noted that neither LPB's alleged non-refundable-deposit policy, nor its all-schedules-are-tentative policy, are contained in LPB's quotation.  Rather, LPB appears to be contending that these terms are part of the contract based on the parties' course of dealing and usage of

23

trade.  UCC section 1-205 governs course of dealing and usage of trade.  Course of dealing is defined as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  N.J. Stat. Ann. 12A:1-205(1).  Usage of trade is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."  <u>Id.</u> at 1-205(2).  Course of dealing and usage of trade "give particular meaning to and supplement or qualify terms of an agreement," and the "express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other."  <u>Id.</u> at 1-205(3), (4).  When such construction is unreasonable, however, "express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."  <u>Id.</u> at 1-205(4).

The UCC does not explain which party has the burden of proof to establish course of dealing or usage of trade, but "'courts are likely to impose the burden of proof on the party who seeks to benefit from evidence of course of dealing, trade usage, or

course of performance.[7]'" <u>Kunststoffwerk Alfred Huber v. R. J.</u>
<u>Dick, Inc.</u>, 621 F.2d 560, 564 (3d Cir. 1980) (quoting J. White &
R. Summers, Uniform Commercial Code § 3-3, at 88 (1972)).  This
view is consistent with the standard for summary judgment, where
LPB, as the non-moving party on Corestar's motion for judgment in
its favor, has the burden to identify specific facts showing that
there is a genuine issue for trial.  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986).

Here, not only do the express terms of the contract refute
LPB's alleged non-refundable deposit and all-schedules-are-
tentative policies, LPB has not submitted any proof that these
policies were a known course of performance between the parties
or standard industry practices.  First, with regard to the non-
refundable deposit policy, LPB claims that Corestar "was aware of
the Defendant's policy and practice that all deposits are
nonrefundable, because it had dealt with Defendant LPB
Communication on prior occasions."  (Def.'s Statement of Facts ¶
21.)  LPB, however, has not submitted any proof that Corestar was
aware of the policy during the execution and performance of the
transmitters contract, and it has not submitted any evidence that
Corestar was aware of the policy during its previous

_____

[7]"Course of performance" is inapplicable here because it
refers to actions with respect to the contract taken after the
contract has formed.  <u>Step-Saver Data Systems, Inc. v. Wyse</u>
<u>Technology</u>, 939 F.2d 91, 104 n.40 (3d Cir. 1991). LPB only refers
to the parties' past interactions.

transactions.  Because LPB has the burden of proving that a
course of dealing existed between the parties, and because a
party opposing summary judgment must do more than just rest upon
mere allegations, general denials, or vague statements, Saldana
v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001), LPB's
contention that Corestar's seventy-five percent deposit was non-
refundable must fail and not be considered part of the contract.

Second, with regard to usage of trade, Corestar argues that
LPB has failed to provide any proof that it is standard industry
practice that specifically-defined schedules for shipment are
always tentative.  The UCC requires that the "existence and scope
of such a usage are to be proved as facts."  N.J. Stat. Ann.
12A:1-205(2).  Again, other an its own unsupported assertions,
LPB has not submitted any proof of its claim that all shipment
dates, even ones specifically set forth in the contract, are
tentative in the transmitter building industry.  Consequently,
LPB's contention that Corestar should have been aware of the
industry practice that the dates for shipment are always
tentative fails as well.  Indeed, to regard LPB's position as
true--that a seller of transmitters never has an obligation to
ship its goods by the agreed-upon shipment date--would prevent a
buyer from ever bringing an action to enforce agreed-upon
contract terms regarding delivery.

Correspondingly, LPB argues that the clause in its

quotation, that "all agreements are contingent upon availability
of materials and all other causes beyond our control," prevents
Corestar from arguing that the shipping delays breached the
parties' agreement.  This argument is untenable for numerous
reasons.  First, LPB's use of its *force majeure*[8] clause to excuse
its failure to comply with the delivery schedule is misplaced.
In order to use a *force majeure* clause as an excuse for non-
performance, LPB's reason for non-performance must have been
beyond its control and not due to any fault or negligence of its
own.  See Gulf Oil Corp. v. Federal Energy Regulatory Commission,
706 F.2d 444 (3d Cir. 1983), cert. denied, 464 U.S. 1038 (1984).
LPB has the burden of proof, as well as a duty to show what
action was taken to perform the contract, regardless of the
occurrence of the excuse.  Id.

The evidence on the record overwhelmingly demonstrates that
LPB's delays were not beyond its control, and were arguably due
to its own mismanagement.  As admitted on numerous occasions by
LPB, its main failure to comply with the delivery schedule was

---

[8] *Force majeure* is, "An event or effect that can be neither
anticipated nor controlled. The term includes both acts of nature
(e.g., floods and hurricanes) and acts of people (e.g., riots,
strikes, and wars)."  Black's Law Dictionary (8th ed. 2004).  A
*force majeure* clause is, "A contractual provision allocating the
risk if performance becomes impossible or impracticable, esp. as
a result of an event or effect that the parties could not have
anticipated or controlled."  Id.

its focus on its government contracts.  From as early as March
29, 2005, which was just a few weeks after the parties entered
into the transmitters contract, LPB was aware of both its
commitment to its government contracts and to Corestar.  (See
Pl.'s Ex. A at P0014, Email from George Kuchmas to Corrina Tan
("We are quite busy finishing up two 10kw Frequency Agile
transmitters for the US government and then we are on to your
project, so we have become quite busy, and that is a good
thing!").

Again, on April 5, 2005, LPB informed Corestar that it
"first needed to get the two" government transmitters "out of
here," and that "these transmitters are slightly behind schedule
but going well."  (Id. at P0020.)  Then, on July 1, 2005, a day
after the first two transmitters should have shipped, LPB
explained that its "problem from the beginning [was] getting the
two frequency agile transmitters for the government out of here."
(Id. at P0030.)  By the end of July, LPB admitted that its delay
on the government transmitters delayed work on Corestar's
transmitters, and that the government transmitters were "special
custom transmitters . . . ordered long before your transmitters."
LPB also stated that it did not have any concern about the
transmitters technically, "it's just a capacity matter and we are
working on this." (Id. at P0040.)  It was not until August 12,
2005 when LPB informed Corestar that it was "stopping all work on

the government transmitter to work . . . fully" on Corestar's transmitters.  (Id. at P0064.)

As simply stated by Corestar in an email to LPB, "It is great that LPB is doing well and securing many government tenders[;] however, if you were not able to deliver according to your offer, our order should not have been accepted."  (Id. at P0065.)  Because LPB proposed the schedule, it was not beyond LPB's control to assess its current orders to determine whether it would be able to meet its shipment schedule for Corestar's order.  Additionally, as early as three months before the first two transmitters were due to Corestar, LPB knew of Corestar's need to have the transmitters delivered on schedule, and at the same time recognized its delays with the government contract.  This situation is not one protected by a *force majeure* clause.

LPB's use of its *force majeure* clause to excuse its delays is also untenable for the same reasons expressed above regarding LPB's professed usage in trade argument.  The shipment schedule for the transmitters was decided by LPB and specified in its quotation.  Corestar agreed to this schedule, reaffirmed it in its purchase order, and relied upon it for its own contracts with its dealers.  LPB should not be able to propose a specific schedule for shipment and at the same time include a contract

term that serves as an absolute defense to any delay.[9]

Next, considering its other contingency clause--that "all agreements are contingent upon availability of materials"--LPB has not presented any evidence that its delay in complying with the shipment schedule was due to the unavailability of materials for the transmitters.  In contrast, Corestar has submitted evidence that LPB did have the parts to build the transmitters. When Corestar expressed the "facts" of the situation of the late delivery, it stated that LPB had the complete transmitter parts to build another three sets of transmitters, but it did not have the capability to complete the transmitters in the timely fashion.  (Pl.'s Ex. A at P00108.)  LPB replied to that contention, and stated, "We are late in our delivery . . . but [w]e will be able to build your entire order."  (Id. at P00107.)

---

[9]This clause may also be unconscionable under N.J. Stat. Ann. 12A:2-302, which provides, "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."  The Comment to this UCC section instructs, "The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."  Because, however, the Court must hear evidence to decide this question, see section 2-302(2), and because LPB's clause is unenforceable for other reasons, the Court will refrain from determining whether the clause is unconscionable under this UCC section.

LPB has not pointed to any evidence in the record to indicate that it experienced delays due to materials for Corestar's transmitters.  Consequently, LPB's reliance on this term in the parties' contract does not absolve it of its late shipment.

Looking at the express language of the parties' contract, Corestar bargained for a specific delivery schedule, and paid a seventy-five percent deposit in consideration of that schedule. LPB argues, however, that if Corestar "wished firm delivery dates for the transmitters and modules, then it had the obligation to establish firm contractual provisions regarding same and to require specific provisions pursuant to New Jersey law allowing it to cancel the contract in the event that these firm delivery dates were not complied with by" LPB.  (Def.'s Reply at 18.) Corestar, however, did just that: it relied on the shipment schedule proposed by LPB, and it included a contractual term in its purchase order expressly allowing it to cancel an order if the transmitters were not delivered within the time specified and according to specification.  LPB's argument is more applicable to itself: if it wanted the delivery dates to be tentative, it should have (1) provided a provision to that effect in its quotation, and/or (2) objected to Corestar's provision in its purchase order.

Because LPB has not submitted any evidence establishing course of dealing or usage of trade, the express terms of the

contract control.  The express terms provide (1) that Corestar
was permitted to cancel the contract if the transmitters were not
delivered within the time specified and according to
specification, and (2) all agreements are contingent upon
availability of materials and all other causes beyond LPB's
control.  Interpreting these two provisions in harmony,
Corestar's cancellation clause would not be unenforceable if
LPB's delinquent shipment of the transmitters was due to problems
with materials or for reasons out of its control.  As
demonstrated above, however, because LPB has not provided any
evidence that its failure to deliver the transmitters was due to
the unavailability of materials or for reasons out of its
control, LPB's provision is not enforceable, and Corestar's
cancellation provision is.

In holding that Corestar's cancellation provision is
enforceable, Corestar was permitted to cancel the contract for
two reasons: (1) if the transmitters were not delivered within
the time specified, and (2) if the transmitters were not made
according to specification.  Corestar cancelled the contract
after the shipment of the first transmitter on September 27,
2005, which was three months after the contract date.[10]  Corestar

_____

[10]LPB argues that Corestar breached the contract when it
failed to pay the remaining twenty-five percent of the total
contract price when the first transmitter shipped, as was stated
on LPB's quotation.  Corestar argues that LPB agreed to Corestar
paying the remaining twenty-five percent upon shipment of the

contends that the transmitter was faulty, but LPB denies this
claim, and Corestar does not provide any proof that it was
defective, other than its own assertions.  Thus, summary judgment
cannot be entered in Corestar's favor that it was entitled to
cancel the contract under the second termination reason.[11]

Corestar has submitted substantial proof, however, that the
transmitters were not delivered within the time specified.[12]

---

sixth transmitter.  This issue does not need to be decided,
however, because LPB breached the contract first by failing to
deliver the first transmitter on time.

[11]Along with most other UCC provisions discussed in this
opinion, the parties also do not discuss the effect of N.J. Stat.
Ann. 12A:2-607, which concerns a buyer's duty to notify the
seller of receipt of a non-conforming good prior to cancellation
of the contract.  The buyer is precluded from any remedy if the
buyer did not notify the seller of the breach within a reasonable
time after the buyer discovered the non-conformity.  N.J. Stat.
Ann. 12A:2-607(3)(a).  The burden is on the buyer to establish
any breach with respect to the goods accepted.  Id. 2-607(4).
    There is no evidence in the record demonstrating whether
Corestar notified LPB of the non-conforming transmitter after
Corestar's customer received it on October 15, 2005.  Because,
however, Corestar's cancellation of the contract was permitted
for delays in shipping in addition to defective goods, this issue
becomes one for damages.

[12]Even without this cancellation clause, the UCC provides a
remedy for buyers in Corestar's position.  UCC section 2-609

    rests on the recognition of the fact that the essential
    purpose of a contract between commercial men is actual
    performance and they do not bargain merely for a
    promise, or for a promise plus the right to win a law
    suit and that a continuing sense of reliance and
    security that the promised performance will be
    forthcoming when due, is an important feature of the
    bargain. If either the willingness or the ability of a
    party to perform declines materially between the time
    of contracting and the time for performance, the other

33

Consequently, because LPB failed to comply with terms of the transmitters contract, and, thus, breached the contract, Corestar was permitted to treat the contract as broken.  As such, Corestar is entitled to damages.

A similar, yet more simple, analysis applies to the parties' contract for the amplifier modules.  On April 2, 2005, LPB provided Corestar with a quote for 28 amplifier modules.  On April 12, 2005, Corestar sent LPB its purchase order, which contained the same fine-print provisions as for the transmitters order.  The purchase order stated that the amplifiers were to be shipped with the transmitters.  LPB sent an email confirmation that the order was correct and that it would make sure that the amplifiers were delivered with the transmitters.  The next day,

--------

party is threatened with the loss of a substantial part of what he has bargained for. . . . [A] buyer who believes that the seller's deliveries have become uncertain cannot safely wait for the due date of performance when he has been buying to assure himself of materials for his current manufacturing or to replenish his stock of merchandise.

N.J. Stat. Ann. 12A:2-609 (Comment).  Under this provision, a buyer (1) is permitted to suspend his own performance and any preparation therefor, with excuse for any resulting necessary delay, until the situation has been clarified; (2) is given the right to require adequate assurance that the other party's performance will be duly forthcoming; and (3) can treat the contract as broken if his reasonable grounds for insecurity are not cleared up within a reasonable time.  Id.  This section merges these three principles of law and commercial practice into a single theory of general application to all sales agreements looking to future performance.  Id.

Corestar paid the entire contract price in full.  LPB did not ship an amplifier with the first transmitter it shipped at the end of September, and it never shipped any amplifiers thereafter.

It does not appear from the record that LPB prepared a formal quotation as it did for the transmitters order, and, therefore, the fine-print terms in its standard quotation do not expressly apply to this amplifier contract.  Even if, however, the amplifier contract did contain the same terms as the transmitter contract, LPB breached this contract as well. Further, even if Corestar's payment-in-full constituted a deposit, as argued by LPB, for the same reasons expressed above, Corestar's "deposit" was not non-refundable.

Consequently, summary judgment as to LPB's liability for breach of contract must be entered in favor of Corestar on its breach of contract claim, and against LPB on its counterclaim. The parties will be directed in the accompanying Order as to a schedule for filing supplemental briefing regarding damages.

## II.  Corestar's Additional Claims

In addition to its breach of contract claim, Corestar has alleged that LPB has committed fraud, violated the New Jersey Consumer Fraud Act, has unlawfully retained Corestar's money, has unlawfully converted Corestar's property into its own, and that it is an involuntary trustee of Corestar's money.  LPB opposes

35

Corestar's motion for summary judgment on these claims on the basis that since there is no breach of contract, these claims must also fail.  Because it has been already held that LPB did breach the parties' contracts for the transmitters and amplifiers, LPB's argument is unavailing.  It must be determined, however, whether the UCC permits Corestar's additional claims, and if so, whether "the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law."  Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990) (discussing the standard for summary judgment when a motion is in effect unopposed).

The UCC provides,

Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

N.J. Stat. Ann. 12A:1-103; see also 1-103 Comment ("This listing given in this section is merely illustrative; no listing could be exhaustive.").

The Court of Appeals for the Third Circuit has interpreted this provision as providing "the UCC does not displace the common law of tort as it affects parties in their commercial dealings except insofar as reliance on the common law would thwart the

purposes of the code."  <u>New Jersey Bank, N.A. v. Bradford Sec.
Operations</u>, 690 F.2d 339, 346 (3d Cir. 1982).  Thus, Corestar may
pursue claims in addition to its breach of contract claim as long
as they do not conflict with the UCC.

### A.   Fraud

Corestar claims that LPB[13] "knowingly made or caused to be
made material misrepresentations to Corestar in that LPB would be
able to manufacture and deliver" the transmitters and amplifier
modules according to the schedule.  (Compl. ¶¶ 43-44.)  Corestar
also claims that LPB "knowingly made said representations in
order to fraudulently induce Corestar to advance $272,742.75 so
that LPB could utilize said funds to pay its creditors and
capitalize other projects unrelated to Corestar."  (<u>Id.</u> ¶ 46.)
With these assertions, it appears that Corestar is claiming
fraudulent misrepresentation and fraudulent inducement.

The UCC permits a party to assert a claim for fraudulent
misrepresentation and fraudulent inducement in addition to its
UCC-covered breach of contract claim.  <u>See</u> <u>Coastal Group, Inc.
v. Dryvit Systems, Inc.</u>, 643 A.2d 649, 652 (N.J. Super. Ct. App.
Div. 1994) (citation omitted) ("Thus, an action based on facts
showing fraudulent conduct or material misrepresentation may be

---

[13]Corestar asserts this claim, as well as all of its
additional claims, against the individual defendants, Dominick
Spadea and Thomas Spadea.  Whether Corestar can maintain these
claims against the individual defendants is addressed below.

redressed by an action [in tort] for fraud or [a contract action

for] nonfraudulent breach, and there is no need to elect.")).  To

sustain a cause of action for fraudulent misrepresentation under

New Jersey law, the following elements must be proven:

> (1) a material misrepresentation of a presently
> existing or past fact; (2) made with knowledge of its
> falsity by the person making the misrepresentation; (3)
> intent that the misrepresentation be relied upon; (4)
> reliance on the misrepresentation, and (5) damage to
> the party who relied on the misrepresentation.

First Valley Leasing, Inc. v. Goushy, 795 F. Supp. 693, 701

(D.N.J. 1992) (citing Jewish Center of Sussex County v. Whale,

432 A.2d 521 (N.J. 1981)) (other citations omitted)).  The

elements are the same for a claim for fraudulent inducement.

Jewish Center, 432 A.2d at 524.

The Court is unable to determine as a matter of law that LPB

made its promise of a certain delivery schedule with knowledge of

its falsity, or that it continued to knowingly misrepresent when

the first transmitter was to be delivered.  The record clearly

demonstrates that LPB did not comply with the delivery schedule

it created, but there is no definitive evidence that LPB knew of

the falsity of the schedule and that it intended "to obtain an

undue advantage therefrom."  Id.

In considering a motion for summary judgment, a district

court may not make credibility determinations or engage in any

weighing of the evidence.  Marino v. Industrial Crating Co., 358

38

F.3d 241, 247 (3d Cir. 2004).  Instead, the non-moving party's
evidence "'is to be believed and all justifiable inferences are
to be drawn in his favor.'"  Id. (quoting Anderson, 477 U.S. at
255).  Even though LPB has not submitted any specific evidence
refuting Corestar's allegation, LPB has denied that it
fraudulently misrepresented the delivery schedule, and contends
that Corestar "was aware that the Defendant was a small company
who frequently experienced delays in delivery."  (Def.'s Reply at
22.)  In order to determine whether LPB committed this alleged
fraud, the Court would need to weigh the evidence and determine
the parties' credibility.  Because the Court is not permitted to
do so, summary judgment on Corestar's fraud claim must be denied
at this time.

### B.   New Jersey Consumer Fraud Act

The New Jersey courts have held that a claim under the New
Jersey Consumer Fraud Act (CFA) may be maintained in addition to
a breach of contract claim that is governed by the UCC.  Coastal
Group, Inc. v. Dryvit Systems, Inc., 643 A.2d 649, 653 (N.J.
Super. Ct. App. Div. 1994)(discussing Dreier Co., Inc. v.
Unitronix Corp., 527 A.2d 875 (N.J. Super. Ct. App. Div. 1986));
Hundred East Credit Corp. v. Eric Schuster Corp., 515 A.2d 246,
248 (N.J. Super. Ct. App. Div. 1986), cert. denied, 526 A.2d 146
(N.J. 1986) ("Nothing in [the] statutory language suggests that
the Act is inapplicable to the sale of merchandise for use in

39

business operations. To the contrary, the language on its face makes the Act applicable to all sales of 'merchandise' without regard to its intended use or the nature of the buyer. And a corporation or other business entity is a 'person' entitled to sue under the Act.").

The elements of a CFA claim are: (1) unlawful conduct by the defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss.  Cox v. Sears Roebuck & Co., 647 A.2d 454, 462-63 (N.J. 1994).  The New Jersey Supreme Court in Cox explained what constitutes "unlawful conduct":

> To violate the Act, a person must commit an "unlawful practice" as defined in the legislation. Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations. The first two are found in the language of *N.J.S.A.* 56:8-2, and the third is based on regulations enacted under *N.J.S.A.* 56:8-4. A practice can be unlawful even if no person was in fact misled or deceived thereby. The capacity to mislead is the prime ingredient of all types of consumer fraud.
>
> When the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act.  However, when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud.
>
> . . .
>
> The third category of unlawful acts consists of violations of specific regulations promulgated under the Act. In those instances, intent is not an element

> of the unlawful practice, and the regulations impose
> strict liability for such violations. The parties
> subject to the regulations are assumed to be familiar
> with them, so that any  violation of the regulations,
> regardless of intent or moral culpability, constitutes
> a violation of the Act.

Id. (internal citations omitted).

Corestar argues that it has provided evidence that LPB committed an affirmative "unlawful act" of fraud when it never indicated that it "would be unable to adhere to the delivery schedule provided by LPB and agreed to by Corestar because it knew that Corestar would submit a deposit."  (Pl.'s Reply at 8.) Corestar also argues that "LPB continuously advised Corestar that it was purchasing materials and parts and it was working on Corestar's order, knowing that it would not deliver on time." (Id.)

In order to prevail on its CFA claim, Corestar needs to prove that LPB committed an affirmative "unlawful act"--it does not need to prove that LPB intended to commit an unlawful act. As explained by the court in Cox, "[b]ecause any breach of . . . contract is unfair to the non-breaching party, the law permits that party to recoup remedial damages in an action on the contract; however, by providing that a court should treble those damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present in addition to the breach."  Id. at 462.

41

Thus, LPB's alleged unlawful conduct must be more than it having breached the parties' contract.  By Corestar arguing that LPB's unlawful conduct is its fraud, however, the Court is required to determine whether LPB committed fraud, which, as discussed above, the Court is unable to do at this time.  As a result, Corestar's motion for summary judgment on its CFA must also be denied.

### C.   Unjust Enrichment

Corestar has also asserted a claim for unjust enrichment for LPB's retention of Corestar's funds.  Under New Jersey law, "to establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994).  Recovery under a theory of unjust enrichment is not appropriate, however, when a valid, unrescinded contract governs the rights of the parties. Van Orman v. American Ins. Co., 680 F.2d 301, 310 (3d Cir. 1982); see also Moser v. Milner Hotels, Inc., 78 A.2d 393, 394 (N.J. 1951).  Thus, because it has already been determined that a valid, unrescinded contract exists between the parties, Corestar cannot maintain a claim for unjust enrichment, and summary judgment must be entered in favor of LPB on this claim.

### D.   Conversion

Corestar also claims that "LPB has converted Corestar's

42

funds by retaining them after it breached the contract."  (Pl.'s
Reply at 9.)  The elements of common law conversion under New
Jersey law are (1) the existence of property, (2) the right to
immediate possession thereof belonging to plaintiff, and (3) the
wrongful interference with that right by defendant.  <u>Carton v.
Choice Point</u>, 450 F. Supp. 2d 489, 501 (D.N.J. 2006) (citation
omitted).

Even though Corestar's successful breach of contract claim
entitles it to damages, that does not mean that Corestar has the
"right to immediate possession" of all its monies paid to LPB.
Indeed, in its supplemental papers regarding damages, LPB may
argue that it is entitled to remuneration for the one transmitter
it shipped, albeit reduced, perhaps, by Corestar's possible claim
of its expenses in correcting the allegedly faulty transmitter.
Regardless, however, of LPB's position regarding damages, because
Corestar may not be entitled to complete reimbursement of its
funds paid to LPB, Corestar cannot maintain a claim for
conversion.  Consequently, LPB is entitled to summary judgment on
this claim as well.

E.   **Constructive Trust**

Corestar also seeks a declaration that LPB holds a
constructive trust for the benefit of Corestar.  A constructive
trust may be imposed where the failure to do so will result in
unjust enrichment.  <u>D'Ippolito v. Castoro</u>, 242 A.2d 617, 619

(N.J. 1968).  "Generally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence . . . which has resulted in a transfer of property."  Id.

Here, because Corestar cannot maintain a claim for unjust enrichment, and because no finding has been made that LPB committed fraud, Corestar's request for a declaration that LPB is maintaining a constructive trust for Corestar's benefit cannot be entered at this time.

### III. Corestar's Claims against Individual Defendants

Corestar has asserted all its claims except for breach of contract against Dominick Spadea, Chairman and CEO of LPB, and Thomas Spadea, President and shareholder of LPB.  In order for personal liability to attach to the individual defendants, Corestar must "pierce the corporate veil," which courts generally will not do absent fraud or injustice.  See Lyon v. Barrett, 445 A.2d 1153, 1156 (N.J. 1982).  Personal liability will only be imposed if it is demonstrated that the officer or director disregarded the corporate form and "utilize[d] the corporation as a vehicle for committing equitable or legal fraud."  Marascio v. Campanella, 689 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1997).

Corestar has presented no evidence that either Spadea acted in any capacity other than as Chairman or President of LPB.

44

Consequently, the individual defendants are entitled summary judgment in their favor on all of Corestar's claims against them.

## IV.  Conclusion

For the reasons expressed above, Corestar is entitled to summary judgment on its breach of contract claim as to LPB's liability, and on LPB's breach of contract counterclaim.  LPB is entitled to summary judgment in its favor on Corestar's claims for unjust enrichment and conversion.  The individual defendants are entitled to summary judgment on all of Corestar's claims against them.  Summary judgment is denied as to Corestar's fraud, New Jersey Consumer Fraud Act, and constructive trust claims. Thus, the remaining issues for adjudication in this case are Corestar's damages for LPB's breach of contract and Corestar's fraud, CFA, and constructive trust claims.  An appropriate Order will be entered.


Dated: May 10, 2007                    s/ Noel L. Hillman

At Camden, New Jersey                  NOEL L. HILLMAN, U.S.D.J.

45